**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 25 2010 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------- X
                         :

ROSEMARY KAZANJIAN,           :     **<u>MEMORANDUM</u>**
                         :     **<u>DECISION AND ORDER</u>**

                Plaintiff,       :

                         :     09 Civ. 3678 (BMC)

          - against -        :

                         :

MICHAEL J. ASTRUE,            :
Commissioner of Social Security,    :

                         :

              Defendant.      :
--------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff seeks review under the Social Security Act, 42 U.S.C. § 405(g), of the determination of an Administrative Law Judge ("ALJ") that she is not disabled. The determination that I am asked to review reflects the results of her third disability hearing, the decision in the first one having been administratively remanded, and the decision in the second rendered moot by the remand of the first.

      In finding non-disability, the ALJ determined that plaintiff's condition was "severe" as defined under the applicable regulations. There is no dispute that plaintiff's treating physician considers her unable to work in any capacity. There is also no real dispute that his opinion is backed up by medical test results that could be consistent with a level of pain that would render her disabled as defined under the law. On the other hand, those same test results, combined with others, do not necessarily mean that plaintiff has the level of disabling pain that she describes. The ALJ held that she does have the symptoms she describes, but, in effect, is exaggerating their

debilitating impact. Adjusting for that, and rejecting the view of her treating physician, he found her not disabled.

These types of determinations are frequently characterized in part as "credibility" determinations, as the ALJ characterized it here. However, these kinds of cases should not be confused with one of the purposes of determining credibility in social security cases, which is to eliminate malingerers who seek a free ride on taxpayer dollars, or, at the very least, to reject claimants who are so peculiarly sensitive to discomfort that what the mass of Americans would simply put up with and go to work, such claimants would rather not.

Looking at the objective facts concerning her history and characteristics, it seems clear that plaintiff is neither a malingerer nor an eggshell claimant. When these facts are coupled with the test results that are consistent with her complaints, and her treating physician's opinion that she cannot work, then the other test results that tend to support a finding of non-disability, even alongside a state consultative physician's reliance on those results, do not constitute substantial evidence on which the ALJ's decision could be based. The case is therefore reversed and remanded for the calculation of benefits only.

## BACKGROUND

At the time of the hearing before the ALJ on June 3, 2008, plaintiff was 55 years old. She had completed high school and then went on to attend a two-year college that she did not complete. She currently resides with her aunt and is single with no children. Before plaintiff was injured she worked 29 years for the telephone company as a training instructor and sales associate. Plaintiff retired from this job in April 1997, and thereafter obtained another job working as a sales associate for the Disney Store from September 24, 2000 to December 13,

2001. This job involved constant standing and often required her to pick up objects weighing at least 50 pounds.

Plaintiff was first injured on December 13, 2001, when she tripped at work and twisted her ankle, landing on her buttocks. At the hospital, X-rays showed soft-tissue swelling in her right ankle with the suggestion of old trauma, and she was diagnosed with a right ankle sprain and low back strain. After the injury, plaintiff's subjective complaints of pain to her right ankle, knees, legs, neck, and shoulders, as well as numbness of the fingers in both hands, were made consistently to the doctors who examined her. These pains would restrict her from activities such as opening doors and jars, putting on a bra, and tying her shoelaces. She described her average day as trying to look at a newspaper and trying to take care of her needs, but not always being able to do so. She occasionally watches television and reads. She does not smoke or drink. She also has difficulty sleeping at night due to her inability to get comfortable. Her ability to stay stationary is also restricted as she can only sit or stand for 15 minutes at a time. The last time she drove a vehicle was in 2001. Due to her lack of mobility, plaintiff went from approximately 190 pounds in 2001, to approximately 230 pounds in 2005, and she has been continually gaining weight ever since. As plaintiff is five feet tall, her current weight qualifies her as obese. She claims that the heaviest thing she can lift is "maybe a five-pound bag of potatoes."

Treatment options for plaintiff have ranged from taking pain medication to physical therapy. Over the course of treatment plaintiff was instructed to take Motrin, Advil, Vioxx, Tylenol, Aleve, Celebrex, and Mobic. Plaintiff was often recommended for physical therapy two-to-three times a week. A summary of the plaintiff's other medical findings can be found below:

# I.    Treating Physicians

## A. Dr. Elie J. Sarkis (orthopedic surgeon)[1]

Plaintiff was first seen by Dr. Sarkis, on December 17, 2001, just a few days after her initial injury. She complained of pain in her neck, left shoulder, dorsal spine, low back, knees, and right ankle. Dr. Sarkis conducted a full physical examination of plaintiff and found swelling of the right ankle and that she had limited range of motion. His medical impression was sprains of the cervical spine, dorsal spine, and both shoulders; sprain/contusion of the right and left knees; rule out internal derangement of the knees and rule out herniated lumbar disc. He also noted that plaintiff was being treated for bilateral carpal tunnel syndrome for which she wore braces at night. Dr. Sarkis prescribed Motrin and told plaintiff to elevate and ice her ankle and wear an air cast.

Three days later, plaintiff returned to Dr. Sarkis due to pain and swelling in her right ankle and knee. An examination of plaintiff revealed pain and tenderness over the lateral malleolus and the fifth metatarsal,[2] and a +1 edema over the dorsum of the foot and ankle.[3] Plaintiff had right knee pain and tenderness over the medial and lateral joint line, as well as on flexion and extension. Dr. Sarkis took X-rays of the cervical and lumbosacral spine, which revealed disc narrowing and degenerative osteoarthritis[4] at C4-C5, C5-C6, and C6-C7, and

---

[1] Some of the medical analysis occurred after plaintiff's insured status expired on March 30, 2005. Although defendant relies on this to some extent, there is no suggestion in the record that the conditions reflected in these later evaluations were inconsistent with her condition during the insured period.

[2] A malleolus is a rounded process, such as the protuberance on either side of the ankle joint at the lower end of the fibula and the tibia. A metatarsal is one of the five cylindrical bones extending from the heel (the tarsus) to the toes on each foot. The fifth metatarsal goes to the littlest toe.

[3] Edema is the swelling of soft tissues as a result of excess water accumulation.

[4] Osteoarthritis is a type of arthritis marked by progressive cartilage deterioration in fluid-filled joints and vertebrae.

narrowing of the L5-S1 lumbar region associated with degenerative osteoarthritis. He referred plaintiff for physical therapy.

A week later, plaintiff went to see Dr. Sarkis because her pain was increasing. The pain in her neck and shoulders was now in her lower back and radiating down to the buttocks and upper thigh. She was also continuing to have pain in both knees and her right ankle. Dr. Sarkis' findings were unchanged from the previous examination, and he directed plaintiff to start physical therapy and continue taking Motrin.

Thereafter, plaintiff continued to see Dr. Sarkis regularly in two to three week internals. These examinations were marked by similar complaints of pain in her ankle, shoulders, neck, back, and knees. On March 11, 2002, plaintiff began to complain of numbness in her right hand, and symptoms of tingling and pain in her right hand were also noted in other examinations.

In September 2002, Dr. Sarkis referred plaintiff for a magnetic resonance imaging scan (MRI) of her cervical spine.[5] The MRI revealed diffuse disc desiccation (the spreading and drying out of the discs); C4-C5 and C5-C6 posterior minimal subligamentous disc bulges; C6-C7 posterior disc herniation with ventral CSF (cerebral spinal fluid) impression, cord abutment, left-sided foraminal narrowing, and adjacent posterior vertebral osseous edema, with anterior disc herniation and spurring, and a 12mm lesion suggesting hemangioma at C7.[6]

Plaintiff continued to complain of pain to her shoulders, right ankle, back, neck, and buttocks. She visited Dr. Sarkis regularly from every two weeks to monthly, with examination

---

[5] The MRI was taken on September 20, 2002 but reported on September 23, 2002.

[6] Hemangioma is a common type of congenital vascular malformation or benign tumor made up of newly formed blood vessels clustered together; which may be present at birth or appear a little later. The most common type appears as a network of small blood-filled capillaries near the surface of the skin, forming a red to purple birthmark. Other types are sometimes found in the liver and in bones. All of the conditions found in the September 20, 2002 X-ray have been known to cause pain.

results remaining consistent at these visits. However, on March 20, 2003, she complained that the numbness and tingling in her fingers was now in both hands.

A few days later, plaintiff visited Dr. Sarkis after she fell and injured her right knee when her right ankle gave away while walking. She complained of having difficulty standing, sitting, and ambulating. An examination of the right knee revealed swelling with an abrasion overlying the patella and tenderness over the anterior aspect. The right ankle was swollen with pain and tenderness over the lateral and medial malleolus area, and she had mild limitation of motion. An X-ray of the ankle was taken on March 27, 2003, and revealed no fracture or dislocation, but showed a calcaneal spur[7] on the right heel.

Plaintiff continued to visit Dr. Sarkis once or twice monthly. On July 31, 2003, plaintiff told Dr. Sarkis that her right ankle had given way again, this time causing her to injure her right ankle, left knee, and left hip. His examination revealed pain and swelling of the left hip and left iliac crest.

On October 6, 2004, Dr. Sarkis completed a medical assessment of plaintiff's ability to perform work related activities. Dr. Sarkis opined that plaintiff was limited to occasionally lifting/carrying five pounds, with a maximum of five to eight pounds frequently; standing/walking two hours per day and 15 minutes without interruption; and sitting 1.5 hours per day and 15 minutes without interruption. In addition, her ability to feel was affected. Plaintiff could not perform postural activities such as climbing, kneeling crouching, stooping, balancing, or crawling, and her impairment caused environmental restrictions such as avoiding heights and moving machinery. Dr. Sarkis concluded that "patient is totally disabled."

---

[7] A bony spur projecting from the back or underside of the heel bone that often makes walking painful.

Plaintiff continued to visit Dr. Sarkis regularly, with virtually no change in her level of pain. In a report dated April 11, 2005, Dr. Sarkis noted that plaintiff continues to have pain, limitation of motion, swelling, difficulty ambulating, and numbness of the fingers in both hands. His impressions were: (1) sprain cervical spine with subligamentous disc bulges C4-C5, C5-C6, and a herniated disc at C6-C7; (2) sprain dorso-lumbar spine and radiculitis, L4-L5 posterior disc herniation with ventral thecal sac compression[8] and foraminal narrowing; (3) sprain right ankle with intrasubstance tear of the tendo-Achilles; (4) sprain/contusion right and left knees, ruling out internal derangement; and (5) bilateral carpal tunnel syndrome.[9] Once again, Dr. Sarkis concluded that "the patient has sustained a permanent disability."

Dr. Sarkis' impression of plaintiff's condition was virtually unchanged in November 2005. In his notes dated November 18, Dr. Sarkis diagnosed plaintiff with multiple herniated cervical discs with radiculopathy;[10] herniated lumbar spine at L4-L5 without radiculopathy; bulging lumbar spine; and partial intrasubstance tear of the Achilles tendon in her right ankle.[11] He proffered the same medical assessment of plaintiff's ability to perform work-related activities as he did on October 6, 2004. He concluded that "patient is totally disabled and unable to sustain any gainful employment or activity."

Plaintiff's condition continued to deteriorate. On November 13, 2006, an MRI of her right knee revealed degenerative disease, chrondromalacia patella,[12] minimal joint effusion, and

---

[8] The thecal sac is the protective enclosing membrane that surrounds the spinal cord.

[9] Each of these symptoms can cause pain.

[10] The disease of the nerve roots, known to cause pain along the nerve.

[11] Partially tearing the Achilles tendon often results in pain and difficulty walking.

[12] The softening of the cartilage underneath the patella.

a minimal Baker's cyst.[13]  On March 31, 2008, Dr. Sarkis determined that plaintiff had De

Quervain's tenosynovitis in the left hand.[14]

Finally, on May 13, 2008, Dr. Sarkis wrote a note which stated that plaintiff was under

his care for injuries she sustained to her neck, low back, right knee, right ankle, and bilateral

hands.  He diagnosed her with multiple herniated cervical discs with radiculopathy; herniated

lumbar spine with L4-L5 radiculopathy; bulging lumbar spine; partial intrasubstance tear of the

Achilles tendon in her right ankle; bilateral carpal tunnel syndrome; De Quervain syndrome in

her left hand; minimal joint effusion; and degenerative disease, chondromalacia patella, and a

Baker's cyst in her right knee.  Dr. Sarkis concluded again that "patient is totally disabled and

unable to sustain any gainful employment or activity."  The complementing medical assessment

of plaintiff's ability to perform work-related activities completed on May 13, was the same as

those completed on October 6, 2004 and November 18, 2005.

### B. Dr. James Liguori (neurologist)

Plaintiff was referred to Dr. James Liguori by Dr. Sarkis.  Plaintiff was first evaluated by

Dr. Liguori on April 2, 2003.  Her chief complaints were neck pain, numbness and tingling of

hands, low back pain, shooting pain in both feet, and right ankle pain.  At this point plaintiff had

completed two courses of physical therapy without any improvement and a cortisone shot in her

right hand that provided only temporary relief.

Dr. Liguori found plaintiff's motor exam and tendon reflexes to be normal, but noted

cervical and paraspinal muscle spasm.  Sensory loss was found in a C5-C6 distribution of both

---

[13] A Baker's cyst is a liquid-filled pouch arising from the bulging out of the liquid-filled lining of the knee.  All of the conditions in the November 13, 2006 MRI are known to cause pain.

[14] The inflammation of the tendon and tendon sheath lining in the hand, a common symptom of which is pain.

arms as well as in an L4-L5 distribution of the right leg. Dr. Ligouri's impressions were cervical radiculopathy with spinal cord involvement as documented by MRI testing, lumbosacral radiculopathy, and status post right ankle trauma.

Dr. Liguori requested a somatosensory evoked potential (SSEP)[15] test of plaintiff's upper and lower extremities, both of which were normal. He also had her undergo various MRIs. The MRI of her right ankle suggested a partial intrasubstance tear of the Achilles tendon.[16] The MRI of her lumbar spine showed a transitional lower intervertebral disc at S1-S2, L3-L4, and L5-S1, posterior disc bulges; L4-L5 posterior disc herniation with a ventral thecal sac impression, and foraminal narrowing.

Plaintiff returned to Dr. Liguori on April 30, 2003. Dr. Liguori's impression was cervical and paraspinal muscle spasm, sensory loss in a C5-C6 distribution in both arms, and sensory loss in an L4-L5 distribution of the right leg. Electromyogram and nerve conduction velocity (EMG/NCV) testing of plaintiff's upper extremities revealed severe bilateral carpal tunnel syndrome, greater in the left hand than the right. EMG/NCV testing of the lower extremities revealed right L4-L5 radiculopathy.

### C. Steven Berman and Ellen Bodner (physical therapists)

Plaintiff saw Ellen Bodner for physical therapy between December 18, 2001 and June 26, 2002, two to three times a week. In an application for disability benefits filed by Ms. Bodner, she diagnosed plaintiff with cervical radiculopathy and a right ankle sprain. Plaintiff's symptoms were neck pain radiating into the left arm and right ankle pain with swelling. Clinical findings were +3 spasms of the left upper trapezius, 3+/5 motor strength of the left lower

---

[15] SSEP's are used to test spinal cord function.

[16] The examination was, however, limited by motion artifact

extremity and right ankle, and +2 edema in the right ankle, and gait was antalgic secondary to ankle pain.[17]  She determined that plaintiff was limited to occasionally carrying a maximum of 10 pounds, standing/walking up to six hours per day, and could only push/pull 10 pounds with hand and foot controls.

Plaintiff had also received physical therapy twice a week from Mr. Berman from October 25, 2002 to November 18, 2002.  The treating diagnoses were cervical and lumbosacral spine derangement and left cervical radiculopathy.[18]  Plaintiff's symptoms included pain on the right side of the cervical spine radiating down the left arm, low back pain, paraspinal spasm in the neck and low back, left arm weakness, left shoulder weakness, and decreased cervical flexibility.  Clinical findings consisted of left shoulder weakness with 3+/5 muscle strength, and plaintiff's gait was stiff with a shortened stride.  Mr. Berman opined that plaintiff was limited to lifting/carrying a maximum of five pounds, walking/standing for less than two hours per day, sitting less than six hours per day, and was limited in pushing/pulling with hand and foot controls.

### D.  Dr. Kyung Seo (orthopedics)

Plaintiff saw Dr. Kyung Seo for a consultative examination on May 8, 2003.  Plaintiff complained of consistent pain in her neck radiating down to both shoulders, numbness of both hands, low back pain radiating down to the right buttock, and left shoulder pain radiating down to her low back.  Daily living activities were reported as "somewhat limited."  Dr. Seo's impressions were trigger finger in right third finger, carpal tunnel syndrome in right hand, status

---

[17] A limp adopted as to avoid pain on weight-bearing structures.

[18] Steven Berman filed a report regarding plaintiff's application for disability benefits on May 5, 2003.

post sprain of the right ankle, intact Achilles tendon, lower back derangement with probable myofascial pain.[19] His final medical assessment of plaintiff's ability to sit, stand, bend, lift, and carry heavy objects was found to be slightly limited.

## II.    State Medical Experts

Dr. B. Kapanian testified at a hearing before the ALJ on November 22, 2005, in connection with plaintiff's first application for benefits. He testified that plaintiff's impairments did not equal or meet the criteria of a listed impairment. This was *solely* based on his review of the evidence of record, as Dr. Kapanian never examined the plaintiff.

Dr. Louis Lombardi testified before the ALJ at the third hearing on June 3, 2008. Dr. Lombardi is an orthopedist. He criticized Dr. Liguori's EMG evaluation, in which Dr. Liguori indicated that plaintiff had severe carpal tunnel syndrome, because it did not have any tracings or graphs to support its conclusion. He also criticized Dr. Liguori's report describing a sensory loss in a C5-C6 distribution bilaterally and L4-L5 distribution on the right side, on the ground that the report was not very specific and did not provide the actually distribution. He testified that the measurements associated with the various upper extremity muscle groups were normal. Dr. Lombardi concluded – without examining the plaintiff – that her impairments did not qualify as a listed impairment as of March 30, 2005, the date plaintiff was last insured.

## III.   State Vocational Expert

Andrew Pasternak, a vocational expert, testified at the hearing on June 3, 2008. Mr. Pasternak stated that plaintiff's past jobs were exertionally light. He considered plaintiff's past work as a training instructor as skilled work and her work as a sales associate as semi-skilled

---

[19] Myofascial pain is characterized by specific points on a muscle that are painful when touched.

work. He found plaintiff's skills in these areas to be transferable to other work. Based on the plaintiff's age, work experience, and limitation to sedentary work, Mr. Pasternak concluded that plaintiff could perform the jobs of a telemarketer, with about 300,000 jobs nationally and about 12,000 jobs locally; a telephone operator, with about 52,000 jobs nationally and about 2,400 jobs locally; and an order clerk, with 330,000 jobs nationally and about 9,000 jobs locally.

## THE ALJ'S DECISION

Applying the familiar five step process described below, the ALJ found that plaintiff had severe impairments of pain in her neck, head, shoulders, hands, lower back, knee, and ankle. However, the ALJ found that these impairments or combination of impairments did not meet the requirements of the Social Security Administration's Listing of Impairments. 20 CFR Part 404 Subpart P, Appendix 1. The ALJ also found that plaintiff had the residual functional capacity to perform sedentary work. Based on the evidence in the record, the ALJ found that although the medically determinable impairments could produce the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were found to be "not credible." The ALJ based his conclusion on inconsistencies in the assessment of the plaintiff's residual functional capacity by Dr. Sarkis. He cited that Dr. Sarkis' report mentioned "no sensory loss, muscle weakness, or atrophy . . . [t]hus, it falls short of the listings."

Furthermore, the ALJ found that the plaintiff's testimony was not supported by medical evidence because "the [plaintiff] was not seen at a hospital subsequent to the emergency room initial visit . . . [and] the treating doctor did not indicate a necessity for more intense treatment. Therefore, there is a credibility issue here that fails to support the [plaintiff's] allegations."

Based on the testimony of the vocational expert, the ALJ also found that there were jobs available in the national economy that the plaintiff could have performed given her age,

education, work experience, and residual functional capacity. Since the plaintiff was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy . . . [a] finding of 'not disabled' is therefore appropriate . . . ."

## DISCUSSION

### I.    The Legal Framework

Disability benefits are available to anyone who is deemed "disabled" as that term is defined in 42 U.S.C. §§ 423(d) and 1382c. A person is "disabled" when:

> he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" consists of "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic technique." Id. at § 1382c(a)(3)(D).

The Commissioner determines whether a claimant meets the statutory definition of "disabled" in five, successive steps. See 20 C.F.R. § 416.920; Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). These steps may be summarized as follows:

(1)    Is the claimant gainfully employed? If he is, then he is not disabled. If he is not, then the analysis proceeds to the second step.

(2)    Does the claimant have a "severe" impairment(s) -- i.e., one that significantly limits his physical or mental ability to do basic work activities? If he does not, then he is not disabled. If he does, then the analysis proceeds to the third step.

(3)    Does the claimant's impairment(s) meet or equal a "listed impairment"? If it does not, then the analysis proceeds to the fourth step. If it does, then he is disabled.

(4)    Does the claimant's impairment(s) prevent him from doing his "past relevant work?" If it does not, then he is not disabled. If it does, then the analysis proceeds to the fifth and final step.

(5)    Does the claimant's impairment(s), considered in conjunction with his residual functional capacity, age, education, and past work experience,

> prevent him from engaging in other substantial gainful work reasonably
> available in the national economy? If it does not, then he is not disabled.
> If it does, then he is disabled.

Id. To determine the answers to steps 4 and 5 of this process, the ALJ must consider the

claimant's "residual functional capacity," which is the most an individual can still do despite

their physical and/or mental limitations that affect what they can do in a work setting. See 20

C.F.R. §§ 404.1545. In other words, once the ALJ analyzes how much plaintiff can do despite

his impairments, he compares that ability to the requirements of his past job (step 4); if plaintiff

cannot do his past job, the ALJ then considers whether there are other jobs that plaintiff can do

despite his impairment (step 5). Thus, one can only be deemed "disabled" at the third and fifth

steps of the determination, whereas one can be deemed "not disabled" at every step except the

third one.

"The burden of proving disability is on the claimant." Mimms v. Heckler, 750 F.2d 180,

185 (2d Cir. 1984). "[O]nce the claimant has established a prima facie case by proving that his

impairment prevents his return to his prior employment [step four], it then becomes incumbent

on the [Commissioner] to show that there exists alternative substantial gainful work in the

national economy which the claimant could perform, considering his physical capability, age,

education, experience, and training." Id.

In weighing the medical opinion evidence, the ALJ is obligated to adhere to the rules set

forth in 20 C.F.R. § 416.927(d) (2006). These rules indicate that, generally, more weight is

given to the following: (1) opinions provided by physicians who have actually examined a

claimant; (2) opinions provided by a claimant's treating physicians; (3) opinions supported by

objective relevant evidence; (4) opinions that are more consistent with the record evidence as a

whole; (5) opinions of specialists about medical impairments related to their area of expertise;

and (6) opinions that may be supported by any other factors the claimant brings to the Commissioner's attention. Id. However, the Commissioner must give a treating physician's opinion "controlling weight" if his or her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." Id. at § 416.927(d)(2). This is known as the "treating physician rule."

## II.    Scope of Review

Judicial review of disability benefit determinations is governed by 42 U.S.C. §§ 421(d) and 1383(c)(3), which expressly incorporates the standards established by 42 U.S.C. § 405(g). In relevant part, § 405(g) adopts the familiar administrative law review standard of "substantial evidence," i.e., that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then his decision must be affirmed. The Supreme Court has defined "substantial evidence" to connote "more than a mere scintilla[;] [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971). "In determining whether substantial evidence supports a finding of the [Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." Rivera v. Sullivan, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).

## III. Analysis

I cannot find that the ALJ had legally adequate grounds for disregarding the opinion of plaintiff's treating physician, Dr. Sarkis. To be sure, the ALJ properly discounted Dr. Sarkis' conclusion that plaintiff is "totally disabled"; that she had a "permanent disability;" or that she was "totally and permanently unable to achieve gainful employment," as do I. See 20 C.F.R. § 404.1527(e) (opinions on issues which are dispositive of a case, such as statements that a claimant is disabled, are not subject to the treating physician rule). One reason (among several) that the law does not accord determinative effect to such medical pronouncements, see 20 C.F.R. § 404.1527(e), is that a license to practice medicine does not require detailed knowledge of the social security regulations, and it is those regulations, not medical opinion as to who should or should not work, that must be applied. Nevertheless, this case presents much, much more than a treating physician's application of a label to what he is hearing from the patient.

First, there was abundant objective medical testing that fully supports Dr. Sarkis' evaluation. *All* of the following objective tests reveal conditions that are quite capable of producing severe, sustained, and disabling pain, either by themselves or especially in combination:

- X-rays taken of the cervical and lumbar spine revealed disc space narrowing and degenerative osteoarthritis at C4-C5, C5-C6, and C6-C7. There was narrowing of the L5-S1 lumbar region associated with degenerative osteoarthritis.

- Plaintiff's first MRI of her cervical spine revealed diffuse disc desiccation, C4-C5 and C5-C6 posterior minimal subligamentous disc bulges, C6-C7 posterior disc herniation with ventral CSF (cerebral spinal fluid) impression, cord abutment, left sided foraminal narrowing, and adjacent posterior vertebral osseous edema, anterior disc herniation and spurring, and C7 vertebral 12mm lesion suggesting hemangioma.

- Plaintiff's MRI of her lumbar spine suggested a transitional lower intervertebral disc at S1-S2, L3-L4, and L5-S1, posterior disc bulges, L4-L5 posterior disc herniation with a ventral thecal sac impression, and foraminal narrowing.

- An X-ray of plaintiff's ankle revealed calcaneal spur on the right heel.

- An MRI of plaintiff's right ankle suggested a partial intrasubstance tear of the Achilles tendon.

- Two EMG/NCV tests revealed severe bilateral carpal tunnel syndrome and right L5-L4 radiculopathy, respectively.[20]

In light of these results, I do not see how the ALJ could find that "the treating source records are based on subjective complaints and not clinical findings consistent with laboratory and diagnostic tests … ." If the ALJ wanted additional objective tests to confirm plaintiff's subjective complaints, I do not know what they would be; these are the tests that are used to confirm diagnoses like that made by Dr. Sarkis. Notably, the results set forth above are not his interpretations – they are the results read by the independent radiologists and neurologist who performed them.[21] Thus, this is not a case of a treating physician interpreting results liberally to benefit a patient at the cost of the public dole.

Second, Dr. Sarkis did not merely conclude on the basis of this evidence and his evaluation of plaintiff's more subjective reporting that she was "totally and permanently unable to achieve gainful employment." He specifically found that she could only sit 1.5 hours per day and 15 minutes without interruption. There is nothing inconsistent about that conclusion and the test results set forth above, and if one credits plaintiff's self-reporting, as discussed below, the conclusion is compelled. Obviously, a person who has to get up every 15 minutes because sitting becomes too painful cannot maintain sedentary employment.

---

[20] Defendant makes much of the fact that a number of plaintiff's neurological tests were unremarkable. As Dr. Sarkis concluded, the musculoskeletal conditions described above are fully consistent with severe pain even in the absence of further neurological involvement. Even the expert witness called by the ALJ at plaintiff's first hearing confirmed carpal tunnel syndrome, and the expert at the second hearing could only quibble with the degree of detail in some of the testing.

[21] Dr. Sarkis only interpreted plaintiff's X-ray images.

Third, Dr. Sarkis was more than a treating physician. He saw plaintiff more than 50 times, at least once a month for over six years. His intensive relationship with plaintiff, the large amount of objective testing, and his board certification in orthopedics, created a strong presumption that the treating physician rule should apply. Against this backdrop, the ALJ rejected Dr. Sarkis' evaluations in favor of two medical experts, neither of which ever examined the plaintiff.[22]

Moreover, the medical experts were limited in their testimony to summarizing parts of the medical record that might tend to support a finding of non-disability and to opining whether plaintiff's conditions met a listing. It seems as if the purpose in calling them was to place upon the record some portions of the medical evidence that the ALJ could seize upon in writing a decision finding non-disability. This isolation of unfavorable (to plaintiff) evidence was an inadequate basis for rejecting Dr. Sarkis' testing and evaluation. True, it is not as if the ALJ ignored Dr. Sarkis' opinion. But in light of the extensive objective tests and long-term evaluative relationship that Dr. Sarkis had with plaintiff, my reading of the record as a whole leaves me with the firm impression that the reference to the treating physician rule in the decision was unctuous.

Paradoxically, the ALJ recognized at one point in his decision that the medical record as a whole did support a finding that plaintiff was accurately describing her limitations, but he was rejecting that evidence based on plaintiff's credibility:

> [T]he undersigned finds that the claimant's medically determinable impairments
> could reasonably be expected to produce the alleged symptoms; however, the
> claimant's statements concerning the intensity, persistence and limiting effects of
> these symptoms, prior to the date last insured, are not credible to the extent they

---

[22] One of the medical experts testified at a hearing in 2005, in connection with plaintiff's first request for benefits. The second expert testified at the June 3, 2008 hearing.

are inconsistent with the residual functional capacity assessment for the reasons explained below.

(Emphasis added). Yet, as shown below, all of the traditional criteria used to evaluate credibility weighed in plaintiff's favor.

First, a reading of her testimony does not admit to the conclusion that she was merely embellishing. Her description of her lifestyle and limitations was so severe, so confining, and her characterization of her pain so debilitating, that even if a fraction of it is true, she lacks residual functional capacity to work. She was either making it up out of whole cloth, or she has no ability to work. However, the ALJ did not find that she was lying – to the contrary, he found that her "medically determinable impairments could reasonably be expected to produce the alleged symptoms." I see nothing implausible, contradictory, or inconsistent in her testimony itself that could support a finding of that she was dissembling, and the ALJ did not point to anything in her testimony to suggest otherwise.

Second, there is nothing in plaintiff's work history that would support a finding of malingering. Quite the contrary. She worked for the same company for nearly three decades, rising to a middle manager level and earning $80,000 per year. When she accepted a buy-out from that job, she took a sales job (which was the position in which she had started at her prior job) in another company at $5.25 per hour, simply because, as she testified, she loved working because she was able to interact with people. It was also clear from her testimony that she would love to keep on working but for her inability to do so. It is noteworthy that plaintiff never had a spouse or children and so the conclusion is suggested that her work life was her primary means of social interaction. Now she sits at home all day with her elderly aunt.

Defendant here points out that a solid work ethic like that of plaintiff is not determinative of credibility. However, not only are ALJs "specifically instructed that credibility determinations should take account [a claimant's] 'prior work record,'" Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998) (quoting SSR 96-7p, 61 Fed.Reg. 34,483, at 34,486 (1996)), but "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983); see also Singletary v. Sec'y of Health, Educ. & Welfare, 623 F.2d 217, 219 (2d Cir. 1980) ("[A] life history of hard labor performed under demanding conditions over long hours .... justifies the inference that when [claimant] stopped working he did so for the reasons testified to."). The ALJ therefore erred in failing to consider plaintiff's thirty-plus years of work history.

Finally, the ALJ made no mention of the fact that plaintiff is obese by any standard. She is five feet tall or less and weighs nearly 260 lbs.[23] Defendant points out that plaintiff did not identify obesity as an impairment in her disability report or application for benefits and thus the ALJ was not required to consider it. See Picinich v. Astrue, No. 3:08-cv-0578, 2010 WL 890955, *9 (N.D.N.Y. Mar. 9, 2010) ("[T]he ALJ is required to consider only those impairments that Plaintiff claimed to have, or about which the ALJ received evidence."). Nonetheless, her obesity does become a factor in evaluating the credibility of statements as to the "intensity, persistence, and limiting effects" of her symptoms. See S.S.R. 96-7p, 1996 WL 374186, at *3 (because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," an ALJ will consider the factors listed in the regulations); see also 20 C.F.R. §§ 416.929(c)(3)(i)-(vii) (factors for the

---

[23] Plaintiff testified that in 2005 she weighed approximately 230 lbs.

ALJ to consider include "any other factors concerning claimant's functional limitations and restrictions due to symptoms.)

Because we are dealing with musculoskeletal impairments, her obesity bears mightily on the credibility of her subjective reporting. It does not take a medical degree to conclude that a five foot tall person weighing 260 lbs. who has objective medical testing showing, as the ALJ recognized, "severe" ankle, shoulders, neck, back, knees and wrist impairments, is more likely to experience a higher degree of limitation and pain than someone of the same height and same impairments but who weighs 120 lbs. The fact that plaintiff's small, injured skeleton must support that degree of weight makes it more likely that she is telling the truth when she describes how limited and painful her life has become. See Mielnicki v. Astrue, No. 5:06-cv-1413, 2009 WL 1813227, *5 and n.9 (N.D.N.Y. June 24, 2009) (upholding ALJ's credibility analysis where he appropriately considered a number of the controlling factors listed in the regulations in his decision, including claimant's obesity).

I therefore hold that the ALJ lacked grounds to disregard the conclusions of the treating physician; that there was an inadequate basis to find that plaintiff was incredible; and that when the record is considered as a whole, the evidence relied upon by the ALJ to find non-disability is insubstantial.

The final issue thus becomes whether to remand for a new hearing as to disability or solely for the calculation of benefits. Plaintiff has already been through three administrative hearings. The record is complete. I do not see any way an ALJ could find by substantial evidence that plaintiff is not disabled, nor a basis for rejecting Dr. Sarkis' conclusion that she is. Under these circumstances, remand solely for calculation of benefits is the appropriate remedy. See Simmons, II v. U.S. R.R. Retirement Bd., 982 F.2d 49, 57 (2d Cir. 1992)

## CONCLUSION

Plaintiff's motion for judgment on the pleadings is granted; defendant's motion is denied; and the case is remanded to the defendant solely for the calculation of benefits.

**SO ORDERED.**

s/Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
       August 23, 2010